## A98A1093. SMITH v. THE STATE.
(508 SE2d 490)

McMurray, Presiding Judge.

Defendant was charged in an indictment with a single count of robbery, in that he did "with intent to commit theft, take from the person and immediate presence of [the victim, Jacqueline Wei Su] by sudden snatching, a wallet of value. . . ." The evidence adduced at his jury trial revealed the following:

At approximately noon on April 6, 1995, Ms. Su drove to downtown Atlanta with a co-worker, Carolyn Burrows, on a business trip to the apparel mart. As they turned into a parking lot, defendant walked up to her car. She believed he was the parking attendant. "And he [defendant] came to [the victim], and he said the parking's two dollars, and at that time, [the victim] already [had] the window down. . . ." Even though a sign read $5 for parking, defendant "said, 'Today it's $2.' " Defendant "had a tight braid hairdo, and . . . T-shirt, loose pants. . . . And he had a drink in one hand. But [the victim did not] know which hand. . . . He grabbed [her] $2 and snatched [her] purse at the same time, so quick [the victim could not] even think. . . . [Inside her purse were her] drivers license and one major credit card and . . . maybe 30 something dollars. . . ." In addition to her in-court identification of defendant as the robber, the victim confirmed she had identified defendant "a few days after April 6 [when she went] down to . . . the preliminary hearing in city court[.]" There, "nobody introduced [her to defendant,] but when [she] saw him, [she] knew that's the same person right away. [She] was scared when [she saw] him."

Carolyn Burrows recalled noticing defendant as she and the victim searched for a suitable parking space. "He looked at [Burrows]. [She] looked at him, made eye contact. He was carrying a plastic Sprite bottle walking down the street. . . . [Defendant] tapped on the window, and [the victim] made the mistake of rolling down the window. . . . [Burrows] recognize[d] the defendant as being the same person [she] had seen [before,] still carrying that Sprite bottle, same guy [she] saw four minutes [before] when [they] made a U-turn. . . . He said, 'It's going to be $2 for parking. . . .' " When the victim declined defendant's request to give him a twenty dollar bill, and he would give her the change, "[h]e reached in the car and snatched the change purse. [The victim's] purse was open. . . . He snatched it, . . . reach[ing] in there real fast, scared [Burrows] half to death, and [then] he ran like crazy . . . straight to a one-way street."

Officer R. F. McWalters of the City of Atlanta Police Department interviewed the victim and Burrows after the robbery. The description they gave of the robber included the fact that he was carrying "[a] green 20 ounce plastic Sprite bottle." A quick inspection of the

Techwood area revealed no one who fit the description. Four days later, on April 10, Officer McWalters was on the top of the Days Inn hotel with binoculars when he "observed a [male of defendant's race] walking east on Simpson Street towards Techwood. And he was carrying a 20 ounce green plastic Sprite bottle. And his height and weight fit . . . close to what Ms. Burrows gave . . . from the previous incident." It was defendant. No one else on the street seemed to resemble the description. Officer McWalters interviewed defendant and confirmed "the style of [defendant's] hair, he had like shortcut dreadlocks, and his build and his height and weight [five-eight, 150 pounds] fit the description. And his clothing was pretty close to what Ms. Burrows had initially given [police] from the incident report." Officer McWalters then telephoned Burrows to see if she might be able to come down and identify the suspect, who was standing outside in front of the Days Inn. She arrived in about ten minutes and was informed only that, " 'there's a gentleman here that fits the description that you've given [police]. . . . [T]ake a look and see if you can identify him . . . in any way. If you don't, . . . just go back to work.' . . . [Officer McWalters] made no mention of [defendant] either being him [the robber] or not being him. [He] wanted her [Burrows] to make that decision. . . . Almost immediately she said that's the guy." Once he heard that positive identification, Officer McWalters arrested defendant for robbery by sudden snatching.

The State introduced evidence of defendant's guilty plea to misdemeanor theft by taking, based on a special presentment charging defendant with robbery by sudden snatching. Eugenio Cambron, a native of Mexico, testified that, on the evening of October 6, 1994, he drove "downtown looking for the Grady Hospital." Cambron parked in the parking lot for the Comfort Inn, intending to get a taxi to the hospital. Defendant approached "and he hit the window and [Cambron] said, 'What you need?' [Defendant] said, 'I need you to pay the parking. . . . When [Cambron] park[ed] the truck in there, he [defendant came] to the window, and he asked [Cambron] for $2 for a parking place." Whereupon Cambron identified defendant as the man who rapped on his window. Cambron had a twenty dollar bill in his hand, and when he tried to make change, "defendant [took] the 20 and [ran]."

The jury found defendant guilty as charged. His motion for new trial was denied and this appeal followed. *Held*:

1. Defendant's first enumeration of error contends the trial court erred in admitting the identification testimony. In this regard, defendant moved in limine to exclude the identification testimony of Carolyn Burrows, arguing her initial identification of defendant was impermissibly tainted by the one-man showup four days after the robbery.

"There is 'no per se exclusionary rule applied to pre-indictment confrontations. (Cit.)' *Yancey v. State*, 232 Ga. 167, 169 (205 SE2d 282) (1974). 'Pre-indictment confrontations should be scrutinized to determine if they are unnecessarily suggestive and conducive to irreparable mistaken identification. The totality of the circumstances must be viewed to determine if there is a "likelihood of misidentification which offends due process and 'the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, (and) the level of certainty demonstrated by the witness at the confrontation.' (Cit.)" (Cit.)' *Towns v. State*, 136 Ga. App. 467, 468 (1) (221 SE2d 631) (1975), applying the factors enumerated in *Neil v. Biggers*, 409 U. S. 188 (93 [SC] 375, 34 LE2d 401) (1972)." *Johnson v. State*, 209 Ga. App. 632, 633 (2) (434 SE2d 169).

Defendant first argues that Officer McWalters tainted Burrows' independent recollection, pointing to Burrows' statement under cross-examination that Officer McWalters said to her, " 'I have somebody in custody that fits exactly your description. Can you please come down to the Days Inn?' " But this evidence was adduced only at trial after Burrows identified defendant, and not during the motion to suppress. Rather, at the hearing on this motion, Officer McWalters testified that he espied defendant, who fit the physical description of a "male, approximately five-eight to six foot, about 150 pounds, with a short dreadlock hairstyle, . . . [carrying] a large green Sprite bottle . . . same pants, same sneakers." Officer McWalters "explained to [defendant] why he was detaining him. That there was an incident that happened, and he fit the description, . . . right down to the Sprite bottle. [Officer McWalters] told [defendant his] intention was to get ahold of either one or both witnesses and have them come down and see if they can identify him. . . . When Ms. Burrows arrived, she parked out in front of the Days Inn. [Defendant] was over by the . . . main entrance of the hotel. And when she got out of the car, she looked past me and saw [defendant] and said that was the guy. [Defendant] was . . . handcuffed, at the time[, but you wouldn't know it right away . . . [because] there [were] plainclothes policemen [including a member of defendant's race] that were kind of on either side of him. So he wasn't . . . to the point where you could see it right away. . . . [Ms. Burrows displayed no hesitancy] whatsoever. She was positive." Defendant was detained a total of "20, 25 minutes . . ." before being formally arrested.

Carolyn Burrows, who is Spanish-American, testified that she had "been discriminated against [her]self for being Spanish, and [she could] clearly describe [the subject]." When she responded to Officer McWalters' call on April 10, "Officer McWalters said, 'Look over my

shoulder. Tell me if that's the guy.' [She] looked at him [and] said, 'Yes.' [Officer McWalters] said, 'Okay.' " Burrows "looked at [defendant]. [She] stared. [She] had flashbacks of what happened, and she saw, and [she] looked, and [she] saw. [She] said, 'Yes, that's him.' " Ms. Burrows was concerned that defendant would see her own face. Officer McWalters "said, 'Take your time. Relax. He can't get you.' . . . He said, 'Just relax. You know, tell me if it's him. Tell me if it's not him.' "

" '(P)rompt on-the-scene confrontations and identifications, though inherently suggestive because of the presentation of a single suspect, (nevertheless) are permissible in aiding a speedy police investigation and . . . where possible doubts as to identification need to be resolved promptly, such on-the-spot identifications promote fairness by enhancing the accuracy and reliability of identification, thereby permitting expeditious release of innocent subjects. (Cit.)' *Bennefield v. Brown*, 228 Ga. 705, 706 (3) (187 SE2d 865) (1972)." *Johnson v. State*, 209 Ga. App. 632, 633 (2), supra. In the case sub judice, defendant argues a four-day delay renders this one-on-one showup suspect, relying on *Banks v. State*, 216 Ga. App. 326 (454 SE2d 784). This reliance is misplaced. Careful scrutiny reveals that, while a four-hour delay between the offense and the two-man showup was an undisputed circumstance, that time delay was not the basis for holding "that the identification procedure used in [that] case was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Banks v. State*, 216 Ga. App. 326, 328 (3), 330, supra.

Moreover, that authority is distinguishable in material respects: "Banks was identified while seated in the rear of a police car with [an accomplice,] Ferrell, a person the victim had known for twenty years, and a police officer shone his flashlight in their faces. . . . Additionally, [that] victim's testimony . . . was highly suspect [because the] victim also testified that he was kind of deaf, that he did not pay too much attention to Banks' clothing, and that he was keeping his eye on [the accomplice] Ferrell. . . . Additionally, [that victim] denied that he had given a description of Ferrell's accomplice to police before the showup. . . . Further, the description the victim gave to the police after the offense, but before the showup, differed in important respects from Banks' appearance at the showup[, namely] Banks had a full beard. Also, the victim said the man was dressed in black pants and with no shirt, but Banks was wearing a black tee shirt and pinstriped shorts when he was apprehended." 216 Ga. App. 326, 327 (2), 328, supra.

No such discrepancies appear in the case sub judice. Defendant was noticed in the vicinity of the parking lot where this robbery took place. Burrows had an opportunity to view defendant at the time of

the crime and recognized him as the person she had seen only moments before, indicating a high degree of attention. Her description to police of defendant was highly accurate in terms of height, weight, build, attire, and unusual detail such as the large green soda bottle. Burrows could not see that defendant was handcuffed, although she surmised he was in fact detained by the police. Burrows maintained a high level of certainty at the confrontation and during the motion hearing, as well as at trial. The locus of the showup was near the crime scene and two blocks from where defendant was first seen by Officer McWalters. In our view, the circumstance that this showup occurred four days after the robbery by sudden snatching does not vitiate the societal interest in the expeditious release of innocent suspects, nor, standing alone, does it render this confrontation impermissibly suggestive. Given the high degree of accuracy and certainty presented here, "[t]he trial court's determination that there was, under the totality of the circumstances, no likelihood of irreparable misidentification is supported by the evidence, is not clearly erroneous, and is therefore affirmed. See *Hood v. State*, 199 Ga. App. 774 (406 SE2d 120) (1991)." *Johnson v. State*, 209 Ga. App. 632, 633 (2), 634, supra.

2. "[I]n the absence of a request, a trial court has no obligation to give a limiting instruction regarding similar transaction evidence. *State v. Belt*, 269 Ga. 763 (501 SE2d 1). . . . Regardless of when the defendant wishes the jury instructed on the limited [purposes for which] similar transaction evidence [was admitted], it is incumbent upon him to make a timely request to the trial court for such a charge." *State v. Hinson*, 269 Ga. 862 (506 SE2d 870). Defendant's request Number 16, "that this Court give the patterned charge on the purpose and use of other offenses or Similar Transactions," is inadequate to give. The second enumeration is without merit.

3. In response to a question whether defendant could or could not "have said, 'Take these cuffs off I'm ready to go,' . . . [Officer McWalters replied:] Not from previous experience with [defendant], no." Defendant's motion for a mistrial was denied but the trial court cautioned the officer and then instructed "that last statement made by the officer should be disregarded by the jury. If you don't remember what it is, don't worry about it." Defendant's motion was renewed, and, in his third enumeration, defendant contends the trial court erred in allowing the State to place his character in evidence.

"Whether to grant a mistrial based on improper character evidence is within the discretion of the trial judge. In reviewing the trial court's decision, an appellate court may consider the nature of the statement, the other evidence in the case, and the court's and counsel's action in dealing with the impropriety. We have previously held that curative instructions [are] an adequate remedy when witnesses

improperly placed the defendant's character into evidence by testifying about his prior convictions or criminal acts. In this case, the officer's reference to [his previous experience with defendant] appears to be inadvertent and the trial judge [admonished the officer and] promptly instructed the jury to disregard [Officer McWalters' last statement]. Under these circumstances, we conclude that the trial court did not abuse its discretion in deciding to give [curative instructions] to the jury rather than grant a mistrial." (Footnotes omitted.) *Sims v. State*, 268 Ga. 381, 382 (2) (489 SE2d 809).

4. Defendant's fifth enumeration contends the trial court erred in admitting the similar transaction evidence leading to defendant's guilty plea to theft by taking, based on a prior snatching. We disagree.

This evidence was substantially relevant to show identity and modus operandi. Defendant's sole prior act of robbery by sudden snatching was " 'so nearly identical in method as to earmark [both the prior act and this offense] as the handiwork of the accused.' [Cit.]" *Felker v. State*, 252 Ga. 351, 360 (1) (a) (314 SE2d 621). It is "in the nature of a signature and thus some evidence of the identity of the perpetrator. . . ." *Shaw v. State*, 211 Ga. App. 647 (1), 648 (440 SE2d 245). "The determination that such evidence is more probative than prejudicial is implicit in the trial court's determination that the similar [transaction is] substantially relevant for an appropriate purpose." *Evans v. State*, 209 Ga. App. 606, 607 (2) (434 SE2d 148) (whole court).

5. During cross-examination of Officer McWalters, defendant adduced that Officer McWalters knew defendant "from the area . . . and, in fact, [defendant had] filed a complaint against [Officer McWalters]." Over defendant's character objection, the State was permitted to show that, approximately two years earlier, Officer McWalters "worked the plain clothes down around the Omni, and he [defendant] was scalping tickets, things of that nature, trying to flim-flam people coming over to the Omni during the sporting events. . . . He wasn't arrested[, just told] he needs to move on. . . . And some words were exchanged. [Defendant] went into the precinct and . . . spoke to one of the supervisors about it, and which the supervisor talked to [Officer McWalters, who] explained what the situation was."

Assuming, without deciding, that the State was not entitled to rebut any inference that defendant was arbitrarily rousted or otherwise the object of abuse at the hands of the police, " 'we hold that in the context of the other [extrinsic acts] evidence in the case (that was properly admitted), it is highly probable that the (admission of this evidence) [regarding defendant's scalping tickets] did not contribute to the verdict. (Cits.) Accordingly, this enumeration establishe[s] no ground for reversal.' *Parcell[ v. State*, 198 Ga. App. 439, 440 (1) (401

SE2d 628)]." *Bohannon v. State*, 208 Ga. App. 576, 578 (2), 580 (2) (d) (431 SE2d 149).

*Judgment affirmed. Blackburn and Eldridge, JJ., concur.*

<span style="display:block;text-align:center;">DECIDED NOVEMBER 5, 1998</span>

*Megan C. DeVorsey*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Henry M. Newkirk, Peggy R. Katz, Assistant District Attorneys*, for appellee.